Cambridge Christian School, v. Florida High School Athletic Association. Counselor, you can take your time switching out. Mr. Pannuccio for Cambridge Christian, whenever you are ready. Good morning, may it please the Court, Jesse Pannuccio for Appellant, Cambridge Christian School. Counsel, I have one question. I think the case turns on what evidence is relevant, what is the scope of the evidence that has a bearing on the issues here? Well Your Honor. Is there a difference in opinion between the two sides, I see there is, as to what's relevant? Well, it perhaps depends on which claim we're talking about, free speech or free exercise, but I will say, my friends have attempted to say the only moment the Court should look at is the precise moment on the loudspeaker in 2015 at this game, and if you look at all of the controlling cases, but let's just take the most recent from the U.S. Supreme Court, the Shurtleff case, Shurtleff v. City of Boston. When you're looking at these free speech claims or free exercise claims, you don't look at only the precise moment the government suppressed speech, because if you limited the window to that, the government would always be allowed to suppress speech. They could say, oh, it's always government speech, because right in that instance we wanted it to be and we suppressed it. But in all of those cases, all of these cases, the Court always looks at more. So let's take Shurtleff, for example. The City of Boston tried to say, look, look at flag flying generally. We mostly fly our own flags, and so it's government speech. And the Court said, no, you have to look at this program specifically. There are 20 times a year when you allow other flags to fly, and that is what is relevant to this constitutional analysis. And so here, we would say, you look at the loudspeaker as a whole, all of the sports, the whole game, but even if we do what the FHSAA wants and narrow the window to pregame loudspeaker use, the evidence in this case is undisputed. And this is a very important piece of evidence that's not discussed. The record page, the appendix page is A11177, and this is the corporate deposition of the FHSAA. And we found some scripts where they had allowed welcoming remarks, and they were presented with the question, how often does this happen? And their corporate opponent said, I can share that it's done periodically often. He then gave an example of where he was just at a championship event and this was done. He was then further asked, when you do this, is it scripted? Do you receive it in advance? The answer was, no, not to my knowledge. So the undisputed admission is that they periodically often allow unscripted welcoming remarks even in the pregame. Were these at the football championship or at other championships? Well, what happened in this deposition exchange, if we go back a page earlier on the transcript, it was presented with two scripts in which it was specifically reserved for a principal to give opening remarks at a weightlifting championship. Different sport, same, but I should say, the FHSAA's policies and procedures and bylaws, they don't have different rules for each sport. I mean, obviously, each sport has different rules, but the governance of the championship has the same policies. So he was given an example of weightlifting and we said, okay, we found this example, how often does this happen? And he said, periodically often, was not restricted to any particular sport. Was there any evidence of that happening in sports besides weightlifting? Well, sure. We know that in 2012, they allowed University Christian and Dade Christian to give an opening prayer. 2015 was a change in that. I'm saying the welcoming remarks of the sort that were referenced in that deposition. In that particular deposition, I believe it was weightlifting both boys and girls, so two different sports, if you will, different teams. We then said, how often does this happen? He said, periodically often, wasn't restricted by sport, and then said, I was just in Suwannee High School a month or so ago, again, at a weightlifting and a school athletic director coach was making announcements and welcoming remarks. Have you ever observed in Florida that football gets treated differently in certain ways than other sports? Well, I don't think there's record evidence of that, Your Honor. I think to the athletes who are competing in their sport, whether it's baseball or football or basketball or weightlifting or flag football, I mean, the FHSA has 20-something sports. They have the same policies and procedures that govern them all, and moreover, we know we put in the record hundreds of scripts. They govern the PA the same at all of these events, and they had an unwritten policy that said periodically often we allow this. Now, that was going backwards. Going forwards, they now have put in a supplemental letter that says explicitly our policy is we're going to allow welcoming remarks at every sport before the game. So again, even if we focus solely on the pregame, and we shouldn't, because halftime is relevant as well, and they just turn the microphone over freely to school announcers at halftime, and that's in their written policies. But even if we focus only on that period, the record is clear about that, Your Honor. Do you think it, and I imagine your answer might be yes, so I'll have this question on the other side too. Do you think that the fact that the FHSA used a religious justification when it rejected the request means that it's per se a violation of the First Amendment? Yes, and I think that is clear in the cases that have come down from the Supreme Court in recent years. There's no suggestion of animus, right? It doesn't have to be animus. I mean, what, just take again, I'll go back to shirt lift and what Justice Breyer said in that case. If you read the last few paragraphs of shirt lift, once they get through the government speech analysis, they found it's not government speech. The city of Boston gave one rationale and one rationale only at the time for rejecting the speech, and they said, sorry, it would violate the establishment clause. And what the Supreme Court said in shirt lift is, that is the most egregious form of viewpoint discrimination. It is not permitted under the First Amendment's free exercise and free speech clauses. What if the association thought that it was government speech? And obviously, they don't get to decide that really, and neither do you all, but what if they thought that it was government speech? And so, if it was government speech, they might have been more correct that they couldn't allow a prayer. Now, I think there's some, I'm curious kind of what the parameters of that would be, but wouldn't, couldn't they have been explaining their justification in light of what they thought the nature of the speech would be? Well, they still have to be correct. All of these, in all of these cases, if you look at the recent Supreme Court precedent, and even if you go back to this court's excellent opinions in Chandler 1 and Chandler 2 in 1999 and 2000, in all of those cases, the government actors said, we're worried about the establishment clause, whether they think it's for government speech reasons or just that they would be too entangled, and that's what the FHSA said here at the time, it was an entanglement concern. But either way, the court has made clear in recent years, in the Carson case, in the Shurtleff case, in Espinoza, phantom establishment clause concerns, in other words, ones that cannot be proven out at the end of the day, are not a sufficient reason to suppress religious speech. And if you look at this court's opinion in Chandler, it went even further, it said, not only is it not a sufficient reason, the free exercise clause demands that you permit that speech. You can, if it either is an establishment clause violation or it is not, but if it is not, you cannot go further than the establishment clause requires to suppress religious speech. Let me ask you something, counsel, about standing. Suppose the Lancers had never made a state championship playoff, much less a state championship game. And suppose the only policy was to restrict the speech to non-religious speech at the state championship game, anything else, whatever goes. They've never been there. And they sued to enjoin the rule. Would you have standing? Your Honor, I may have missed the beginning. I think what you're asking, let me just rephrase it. If a team had never made the playoffs, never had a state championship game, but this policy still existed, could that team sue? Right. And they were the laughing stock of the league. Everybody realized, you know, gosh, we got off, we play the Lancers. And they sued and said, when and if we get to the state championship game, dot, dot, dot. Do they have standing? Would you have standing? Understood, Your Honor. So first, I'll just say, my clients will deem it important for me to say they're not the laughing stock. They have made it before, and they'll make it again. And even in the course of this litigation, they were in the playoffs again a few years ago. However, I would think that any team that plays in an athletic league that has a rule that is unconstitutional, and they must compete under that rule, would have standing to challenge it. They don't have to, counsel, they don't have to compete under the rule. The rule doesn't apply to competition and doesn't apply to any team short of the state championship game. And it was purely speculative as to whether or not they would be in the state championship game this year, next year, or ever again. Would you have standing? I would respond to that in two ways, Your Honor. First of all, I think as an ongoing matter, the teams are competing under that rule because the goal every year is to get to the state championship and win. And you would know every year, I'm competing for a little bit less because if I get there, I don't get to have my opening remarks, but every other team, secular teams, do. And it's a bit like, I think, Your Honor, the college admissions cases, if you take Grutter for example. The court has never said, if you can't prove you don't have good enough grades to get into Harvard, then you can't bring a challenge to their admissions policy. You are allowed to try to compete on an equal footing. And I would say that this case would be akin to that. Now I'll also say- Can I bring, let's say that the Florida lottery or the Georgia lottery had a rule that winners could not offer public prayers afterwards to thank God for their winnings. Could I file suit against that particular policy since I really hope and expect to be a lottery winner in the future? Well if you are competing in the lottery regularly- I can show that, but we don't have that record here, Your Honor. These are not infinitesimal chances. Our team made it in 2015. They were in the playoffs again a few years later. And then if you look at the other teams, University Christian, for example, they were there in 2012. They were there in 2015. They were there again a few years later. So in this league, fairly small, the chances that you will make it to a championship are great, are pretty good. Does it matter, though, given the state's new policy in this regard? It's my understanding that these prayers will be allowed going forward. Well they've never said that, Your Honor, and I want to be very clear. The state law says welcoming remarks or opening remarks, I believe it says, and they say they've adopted a policy. But it's very important to look at what the FHSAA said in 2015. This is the- there were two emails that announced this policy. One was before the game and one was after. One is at A12607, the other one is at A12611, and 12611 is especially important. Dr. Deering said, the issue was and is that an organization which is determined to be a state actor cannot endorse nor promote religion. Whether we agree with the decision of the United States Supreme Court or not is of little consequence. The issue is that we will obey and uphold the rule- the law of the land. Now that is a constitutional judgment that they've come to and it's a constitutional policy and that would override any state law, according to them, that says welcoming remarks. So as far as we can tell, the prayer ban is still in place. And remember, they always had a de facto policy as admitted in their deposition of periodically offering welcoming remarks. But over the top of that, they said, but not prayers because we have an establishment clause problem there and we cannot let you proceed with a prayer, even if we allow other opening remarks. Let's say- let's say, for purposes of argument, that there absolutely was a welcoming remarks policy that said no welcoming remarks from either school of any nature, right? I know that's not necessarily the case here, but let's say that that was the policy. And then your client said, we would like to give a prayer, right? Would that improper- and they said, no, you can't because that's religious and we don't like religious speech. Would that improper rejection be a violation, even though in no uncertain terms, no welcoming speeches of any nature, religious or non-religious, would have been allowed? Your Honor, if we had a completely different case without the 14,000 pages of record evidence here, and they had a uniform policy that they had- they had evidence that they had enforced for years that said nobody ever uses the microphone for anything other than the play-by-play or, you know, whatever few things there are, then this would be a different case. But this case isn't close to that and the record is undisputed that it is used for other things. One other point, Your Honor, I just- something Judge Carnes asked- he asked about standing, I believe. I do want to note, under the Uzibunim case, the nominal damages claim for past injury survives no matter what the court decides on the declaratory judgment and adjunctive relief and I should have included that as part of my answer, so I want to- I was going to let you sit down, but now that you brought that up, what about the- what about your client's statement that you- in the pretrial conference that you weren't seeking damages? Does that- does that apply to nominal damages? No, and a few different answers to that. First of all, we are here on the appeal of a summary judgment order. In our complaint, we ask for damages. In our summary judgment brief, we ask for all the relief in our complaint. Again, that includes damages. That's what's on appeal here. This Court has made clear that if you're at the summary judgment stage, anything that's in a pretrial statement or stipulation doesn't apply as waiver. But secondly, even if you look to that pretrial statement, trials are for presenting evidence of disputed issues. So of course, we're not seeking compensatory damages at this point. There's nothing to prove. Uzi Bunim says, if you prove liability and the pretrial statement is clear that we're attempting to prove liability on free exercise and free speech, Uzi Bunim said two years ago in the Supreme Court, you get nominal damages as a matter of law and as a default. Once the Court finds liability, nominal damages. So for example, if this Court were to- I think we've got your argument. Okay. Counsel, counsel, before you sit down, but the Supreme Court didn't say in Uzi Bunim that gave you standing. It simply said it satisfied the redressability requirement of standing. You still have to show a non-speculative particularized injury. And that's where at least my focus is on the standing question. Whether it's too speculative, too unusual, too contingent to support standing. Well, as I- thank you, Your Honor. As I understood the Court's order for supplemental briefing, that question about speculative and I've given you our answer on that, is about the equitable claims. But I think what Uzi Bunim recognizes quite clearly is that- and it was the same situation there. You had a similar situation, a change in policy. When you have a past constitutional violation, it is complete for standing purposes and nominal damages satisfy the redressability prong, which was that issue there. But once the constitutional violation has happened, you have standing to get redressed for that backwards-looking violation. If, but only if, you have a particularized injury. Well, you can- Yes, but because it's backwards- Somebody can come in off- someone can't come off the street and says, I read about this great case and that violated some constitutional rights. I want money and it's redressability because I want nominal damages. You still have to show a particularized to yourself injury. Someone who hasn't been injured could not bring the case for not- for redress of past injury. But in this case, the prayer was denied. That was the injury for backwards-looking legal recourse. I agree there's a different question for forward-looking prospective, injunctive, and declaratory relief. But what Uzi Bunim is very clear about is once the constitutional violation has occurred, you can get nominal damages to redress that. You've been injured and the nominal damages are sufficient for redressability. We keep referring to it shorthand. I just want to make sure that you and I understand this. When you say prayer was denied, what was denied was the use of the PA system pre-game to engage in communal prayer. Correct. Yes, Your Honor. The sincere religious belief of Cambridge Christian is that communal prayer out of the game has to be- I'm just going to make the point that they didn't ban all prayer and say anybody caught praying in the football field, stadium, or anywhere else is going to be asked to leave, for example. Just a quick response to that, Your Honor. You can't use our PA system. That's the extent of the restriction, was it not? Well, I want to be clear about this because I think the district court relied on this in sort of calling the use of the PA a mere preference. It is not a mere preference. The sincere religious belief of Cambridge Christian- I understand that. But I'm just trying to get, if I may bar Mr. Clement's tired old cliche, where the rubber hits the road. And the rubber hit the road, in this particular case, at the PA system. Yes, Your Honor. That's what was- Use of the PA so that everyone could pray together, not just the teammates on the field, but their parents and siblings and family members and fans could pray together. And the only way to accomplish that, and the record is clear on this, the only way everyone in the stadium could hear is through use of the PA system. Thank you. Thank you. Is there more food? When you're ready. Thank you, Your Honor. Daniel Maffud of Holland and Knight on behalf of the APALE, the Florida High School Athletic Association Inc. May it please the court. If I can, I'd like to start with the standing issue, which is a threshold issue, and just address a couple points that were discussed. So first of all, as the court's aware, an injury to entitle a plaintiff to standing for prospective relief has to- the threatened injury has to be both imminent and certainly impending. And here we believe it's neither. It's not certainly impending because, frankly, we don't know if or when Cambridge Christian is going to make it to another championship game. They've made it to one, they might make it to another, but we just- it's only speculation. I mean, these are high school athletes and I wouldn't be comfortable- Do you think the state policy now would or would not allow this conduct to take place in the future? It certainly would. And I think that's the second point is that even if we could guarantee they were going to make the championship game next year, they would have these two minutes to make their statement. And- Their statement could be a prayer? It could, Your Honor, yes. And- I'm sorry, counsel. You still got that email outstanding, never retracted by the former executive director saying it violates the establishment clause, and conspicuously the policy that you adopted or legislature adopted, somebody adopted, doesn't say, comma, including prayer, comma. That's right, Your Honor. And that's actually an important point that distinguishes the current statute from the decision that was made in 2015. So I don't think the association has to repudiate its position in 2015 in order to enforce this statute. And that's because whereas before the question was, in your discretion, will you allow a statement that's a prayer where no other schools are making pregame statements? Now we have a public right. Basically every school has the opportunity to make a statement. And this is a key distinction, too, in terms of viewpoint discrimination or hostility to religion. Now, this is- But you also, counsel, the problem with that is you're going to interpret that with other statements of policy and restriction. And you've got the outstanding email that says to do this would violate the establishment clause. And then you don't come out and say, we retract that, or that was wrong, or the statements you make, the two-minute statement you make, can include anything you would like so long as it's not obscene, including prayer. Your Honor, I think the plain text of the new statute doesn't have any exclusion for prayer and I don't think there's any reason to believe the association would create one. It allows any statement. In fact, it says that the association doesn't have discretion other than those derogatory statements to intervene on the statement, to review the statement, or approve it. So if a school wants to say a prayer, by law, now they have that right. And again, the establishment clause analysis is much different now just because now the case is more like the cases appellant cites where you have a publicly available benefit, whether it's the public flag-raising program in Shurtleff or any of the other cases, this is something where the only reason you're not getting it that everyone else can have it is because of the religious content. Here, in 2015, no one was getting this. This was a special privilege. And it doesn't violate the pre-exercise clause, and there are many cases saying this, to decline to treat religion more favorably than everyone else is treated. Is your argument that before it would have been government speech, but now that this policy allows everyone a welcome, it's no longer government speech? Well, I certainly think the government speech analysis is different. Whether it's government speech, the association hasn't taken a position on that. I certainly think the new statute removes the control that was so prevalent before, which is one of the factors. And I think the establishment clause analysis is also different, setting aside government speech, because it's no longer a discretionary decision to grant more favorable treatment to religion. Now it's, are you going to let religion participate in something everyone else can participate in? Which is really what most of the cases upon sites are about. And why not issue a policy or a clarification or a statement saying the association recognizes that if a school chooses to engage in prayer during that two-minute period, it does not violate the establishment clause? Well, Your Honor, the association didn't come up with the statute. The statute was passed by the legislature, and we think the statute is clear on its face that there's no restriction on the type of statement that can be made other than what's in the statute. Counsel, the fact that the legislature came up with a statute doesn't answer whether or not you are publicly interpreting it to permit prayer or not. That's true, Your Honor. Maybe the association will come out with a statement like that. They haven't yet. But I think, I mean, our judgment was that it's not necessary that the statute is clear. And I think what you'd have to do for standing purposes now is speculate that the association will decline to enforce a statute that's pretty clear on its face. We think as a state actor, you know, statutes come close to the presumption of constitutionality. We have a responsibility to advance a good faith defense of a duly enacted statute. And for the reasons we explained, you know, the analysis under the establishment clause is much different now. We don't think, the religion clauses can be difficult. It's very fact specific. I mean, we had Adler from the 11th Circuit decided, then Santa Fe was decided, and then the 11th Circuit considered it again and decided, well, you know, we still think these prayers at high school graduations are allowed, not withstanding Santa Fe, because it's so fact specific. Here, this would be a facial challenge to the statute. We haven't seen how it's going to be applied. I just don't think it's fair to speculate that the association is going to reach a unilateral judgment that the establishment clause, because of how it applied in 2015, under those circumstances, bars prayer under this new statute. So for that reason, we think the new statute eliminates really any possibility of the injury, even assuming, which we shouldn't, that Cambridge is going to make it to the championship. What is the relevant evidence in this case? That's a good question, Your Honor. I wanted to get to that. I think, so our position is twofold. One is that it really is context-specific, that this Court's decisions make that clear, and MEC, the Court said, government speech is... No, no, no. What is the body of evidence that's relevant in this case? I think the Court should look at the type of speech that the plaintiffs sought, that Cambridge Christian wanted. So they didn't want... Do we look at any history at all? Yeah, so look at all the history of pregame statements over the years. Okay. And all the sports? Everything. I would say you shouldn't look at all the sports, because plaintiff has not given you any evidence to look at the context of those sports and see how it compares. As Your Honor pointed out, football is different in a lot of ways. I think that's... Everyone knows that. I didn't necessarily point it out. I just speculated as to whether Florida sometimes treated it differently. I think your speculation in that case is well-founded. And I think, you know, my friend on the other side said, well, we don't... There's no evidence on that. And that's exactly right. We don't have evidence about what's going on at a boys or girls weightlifting event. You know, if you look at the deposition testimony, there was a context there that was very important that this was the first time in the West Coast of Florida they were hosting an FHSA championship game or championship event. And so for that reason, you allowed government speakers to make unscripted welcoming remarks to celebrate that occasion that they were hosting over that four-year period. And again, so... We've got a very weak evidence. But I speak for myself, from the standpoint of prospective relief, we don't have much, basically. I just don't see it. I speak for... I don't see an injunction forward-looking. Agreed, Your Honor. I think the question is whether or not there was a violation back in 15. Correct. So that's the wrap-up... When I talk about evidence, I'm talking about the evidence having a bearing on that. On prospective relief or... No, no, no, no. On what happened. So yeah. So I think, to answer your first question, it's context-specific. My friend cited shirtlift to say, you know, consider everything, but in fact, shirtlift says the opposite. Shirtlift says, if you look at flags in general, that's clearly government speech, but we're not going to do that. We're going to look specifically at these 20 times a year that we have this different program. And that's what they were seeking to participate in, so that's what we're going to look at. And I think it's the same here. You look at the speech that Cambridge wanted to make. They didn't want to do a halftime show. They didn't want to pay for an ad. They wanted free access to the PA system to do some things other schools weren't allowed to do. So I think you should look at that period of a football championship. But is there anything in the record about other schools requesting opening statements and being denied non-religious opening statements? There isn't, Your Honor. But what you see is that over more than a decade's worth of games every year, it just didn't happen. And I think, because schools understand, this is the... Except in 2012, right? Right. That was the one aberration when it happened. And I think there's no evidence of it happening before then. It's unclear how it was allowed in 2012. And it happened again. And I think at that time, the association realized we need to think about this and come up with a policy that we have to decide, do we deviate from our established practice, or do we maintain our tradition for starting these games? We don't have a, I don't think, from this time period, a written policy that says no opening remarks from either team, do we? That's right. What we have is a longstanding practice and tradition of how the football games were run. Is it longstanding between, say, 2012 and 2015? Is that enough to be longstanding? What we did was we looked at football scripts for 10 years back and then a little bit longer because it's now been seven years of litigation. And what we saw is that 2012 was the only instance in which any school was allowed to make any pregame statement over the PA system at a football championship game. And in fact, arguably in any sport, we don't think that's necessary for the court to consider. But even if you did, I think that it's a clearly established practice. Why aren't the remarks that were allowed at halftime or the control of the PA system allowed at halftime? Why don't you think that should impact our decision? Well, I don't think it has to because, again, I think you should focus on the speech that was requested. And I think you can analogize to the form-based analysis. So in Lodorn v. Groob, the court said, the fact that a university may make a discrete location on a sprawling campus available for public discourse does not compel the conclusion that it must open the doors of all of its facilities. It's the same there. If there's limited access at halftime, that doesn't mean, the association shouldn't have to abolish halftime, in other words, to keep control at this critical pregame period. Is the argument that it's a different forum at different stages in the game, that gets pretty complicated, doesn't it? Well, I mean, I think consistent with the form-based analysis and the way courts look at it. So you can also look at another decision, which is Cornelius, the Supreme Court case about fundraising and were they allowed to participate. The plaintiffs wanted the forum to be the workplace. And it was in the workplace, but it was for a specific program. And so the court said, we're going to look at, or they sought access to a particular means of communication. So I think you can narrow it to fit what the plaintiff's asking for. But I will make the point that even if you look at halftime, there was control there, too. So what we found, there's no written policy saying you can only do what halftime is usually for, because the association relies on the fact that people understood that. And in fact, plaintiff's own cheerleading coach, who was the one who would play the music, she understood the music has to be G-rated. I stuck to the list, the standard list produced by the cheerleading association. And there's no evidence that any school ever used halftime to do more than just a traditional halftime performance. So we think... They just played the music? Or were there any remarks introducing the cheerleaders of the band? So some schools did introduce the band. Again, that's the narrow purpose, I think, that the association brought in these private speakers to participate in government speech of halftime. So I think there was control there, too. Even if the court were to look at halftime and say, well, what happens at halftime changes the nature of the speech at the beginning of the game. I'll ask this to your friend on the other side, too, but do you think that this case gets decided one way or the other on summary judgment? Or do you think there may be something that a jury would need to look at, say, decide what the record really reflects about the policy? Your Honor, I think both sides below agreed that it was a summary judgment case. There were no real facts in dispute. There were some facts that we thought the court might have to reach about, whether there was another way to arrange the prayer where everyone could hear it, whether it's a bullhorn or prayer cards or something. But really, the issues that the court decided both sides agreed were undisputed. And that it was questions of law for the court. I do want to get back to nominal damages, because there are a couple of very important points here. So one, the pretrial statement that is done in the middle district of Florida is binding on the parties. It governs the trial without the need for any further action by the court. The case's appellant sites are from the Southern District of Florida, which, in the 11th Circuit opinion discussing this, drilled down on those procedures. And it specifically said, the parties submit their statement, the court considers it a pretrial conference, makes any modifications that are necessary, enters an order. And this is the key word, thereafter, that statement governs. In the middle district of Florida, it's much different. It says that the parties submit it. The parties must file a final pretrial statement that will govern the trial. So as soon as it was filed, that was going to govern the trial, and there was no need for any further action. So when they said, unequivocally, in no uncertain terms, the parties- No, counsel, the district court was bound by it. Once the parties sign it, district court has no discretion. It goes into effect. I mean, under the rules, it will govern the trial. That's the effect of it. Whether- It won't govern the trial unless the district court approves of it. Whether the district court issues an order and says, I hereby approve, or the district court reads that and says, sounds pretty good to me. So your honor, I don't think- But the district court has to approve the pretrial order. I mean, by definition, it's an order. Pretrial statement becomes an order, does it not? I think, at most, the district court would have had discretion to depart from it. But unless the court did that, which it had no need to do, it would bind the parties. And so the point would be, at that point, once we filed that pretrial statement signed by a plaintiff's counsel, there was going to be no nominal damages at the trial because it said, unequivocally, no parties. Yeah, at the trial, but that doesn't talk about summary judgment, does it? That's right, your honor, but- You only have a role and a function and an existence of the pretrial order, or pretrial statement, excuse me, if there is a trial. Otherwise, it doesn't exist. Even if we ignore the pretrial statement and that unequivocal statement, what that statement reflects is, first of all, it's not a statement of what evidence do you plan to submit. The rule asks the parties to provide a breakdown of the type and amount of monetary damages. And they just said what the reality is, which is they weren't seeking compensatory damages or any other kind of damages. They never disclosed- They didn't say we're not seeking nominal damages, right? And I think that is conceptually different than we're going to have a portion of the trial where we walk you through what our financial damages from this problem were. Well, their obligation under the rule was to disclose any damages they were seeking. And they said no party is seeking damages. You think- No, it didn't. No, no, counsel, it did not say that. It did not say no party is seeking damages. Why don't you read the language to it? I'll have to find that. Neither party claims monetary damages in this action. Oh, whoa, whoa. I thought you said damages. Now you're telling me monetary damages. Well, so it's monetary which- Apparently, apparently the situation is everybody's bound by the pretrial statement except you? No, Your Honor. We're certainly bound by the pretrial statement as well. When I said monetary- Well, let's don't vary from it then, counsel. And there's a difference, at least an arguable difference, between monetary damages and nominal damages. Correct, Your Honor. Monetary is interpreted in some opinions, in some cases, as meaning compensatory damages, make whole damages. Nominal damages is an entirely different thing. Well, I would just point the court to Berean v. Nation Star, where the court said that And so even if you assume that the monetary- So they never requested nominal damages. They never used that term at all in the trial court. And so if you assume that it's subsumed within their request for other kinds of damages, well, they waived those other kinds of damages. So at that point, we think the- Didn't waiver an intelligent relinquishment of a known right? Yes, Your Honor, and I think that's what they did. Well, let me ask you this. Why would they waive nominal damages? Because they, well, so I would say that they never disclosed damages in discovery apart from the pretrial statement. And I think that was a decision they made that- You don't have to disclose nominal damages in discovery, counsel. That's ridiculous. The Supreme Court has said you must have nominal damages when you find certain constitutional rights. We've held First Amendment violation. You must award nominal damages. It's not something you have to disclose. Well, Your Honor, I would just- And why would a party, and knowingly and intelligently, which is required for waiver, abandon nominal damages when they have an absolute right under the binding decisional law to those damages to with $1? Your Honor, I mean, you can ask counsel for the appellant that. I think they wanted to focus on the prospective relief. I think that's what they really cared about. And I think they just let nominal damages go by the wayside. You don't have to focus on nominal damages, counsel. It's not a calculation. It's a dollar. Your Honor, I understand. I understand. So, I would just ask the court to consider Oliver v. Faya where the court said that it's not automatic. It has to be requested by the party if the court- The argument is your brother over here was incompetent. That's- I certainly- No, I mean, that's the gist of it. I don't- I don't think the court would have to publish this opinion, no, Your Honor, but I think standing is a rigid doctrine. It's very important. I don't think the court should play fast and loose with it. I think we've got your argument.  All right. Thank you, Your Honor. Mr. Panuccio, you have three minutes. Okay. Thank you, Your Honor. There's a few points I want to make. First of all, just on that last point, if they really believe the pretrial- I think that counsel has no sense beating that little point to death. Okay. We're good. I'll take the hint. Okay. Let me turn then to the different case they are- For myself. My colleagues want to- Well, I'll just point it out for the record. They did not reserve attorney's fees in the pretrial statement, but then they moved for them. So if they thought it was so binding, they would have not moved for attorney's fees after the fact. But let me get to my other points, which are, one, for the first time ever in seven years, dozens of briefs in this case, we have now heard my friends on the other side say, well, now we're going to challenge standing and eminence. They have never done that before. This is the first time they've ever raised it right here at this podium. We think it's a little late for them. Which our decision- Probably because we asked for a briefing on it, is my guess. Yeah. Our decisions require us inside the jurisdiction. That's a non-starter. Well, that's fair, Your Honor. But I think if they're pointing to evidence of eminence and their doubt that there's eminence, we would think that evidence would have occurred to them sometime before today at oral argument. On the point about whether they're- Whether it would have counseled, but whether it would have or not, it's a decision the court is required to make. That's fair, Your Honor. That's fair. On the question of the change in policy and whether that we still have a live claim there for prospective relief, I would commend to the court the Alladin's Castle case in the U.S. Supreme Court, which said even when you have a change in government policy, if there is evidence that the policy may change back because they have shifted- We're familiar with that body of law. Okay. Fair enough. On the Establishment Clause, for the first time ever, again, a new case, they have- My friend has now said, well, the Establishment Clause analysis has changed. But I would point you to their answer brief, page four and pages 43 to 45, all the recent Supreme Court cases, Carson, Espinoza, Shurtleff, Kennedy, all of those were decided before they put in their answer brief. In fact, those are all the first line of our initial brief. And they said, we stand by our Establishment Clause analysis, and we think it would be constitutionally dubious for us to allow prayer before the game. So for them to now come and say, well, we've changed between the briefing and oral argument, our Establishment Clause view, I think, is not credible. And last minute- I'm sorry, Judge. Well, I mentioned that I would ask you this question too. Do you think that this case definitively gets resolved on summary judgment, or do you think there might be a- if we see confusion about whether there was such a policy, do you think maybe that goes to a jury? Well, Your Honor, we think that if you look at the summary judgment standard, and you look at what are the undisputed facts, we think we are- if you look closely at all the evidence we cite in our brief, and their inability to answer it, we think we are entitled to summary judgment. You don't think there's a fact issue here? I don't think there's a disputed fact issue. There are many facts relevant. Well, we know that. You think there's no issue and dispute? Correct. I think we have put in overwhelming evidence, and if I realize our brief was laden with record cites, there's a reason for that. We built a 14,000-page record, because I would commend to the Court its original opinion in Cambridge Christian I, and it said, go back and develop the record on certain issues. We have developed every one of those issues. Take just for example, the Court said it would be very relevant what happened in 2012, and what happened at the playoff games. The record is undisputed. The prayer happened in 2012. Not only did it happen, their deponent, their witness, said a specific request was made to us, and FHSA management specifically approved it, so specifically that they then wrote it into the script and into the game notes to say, Dade Christian is going to lead a prayer because the association approved it. So there's no doubt about that factual question. There's no doubt that playoff prayer happened in 2012, happened in 2015, and again in 2020. There are no further questions. Thank the Court. Thank you, Counsel. We appreciate your arguments, and we are adjourned until tomorrow.